IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2022 Session

**STATE OF TENNESSEE v. ROY DONALD COONS, JR.**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-2159    Monte Watkins, Judge**

_____

**No. M2021-00202-CCA-R3-CD**

_____

A Davidson County jury convicted the defendant, Roy Donald Coons, Jr., of two counts of second-degree murder, one count of first-degree felony murder, one count of attempted rape of a child, and one count of aggravated criminal trespass, for which he received an effective sentence of life imprisonment plus twenty-five years.  On appeal, the defendant argues the trial court erred in allowing the admission of the victim's text messages, in permitting the State to introduce an excessive number of photographs of the victim, and in imposing consecutive sentences.  The defendant also contends the evidence presented at trial was insufficient to support his convictions.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.  However, we remand the case for corrected judgment forms in counts one and three.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
and Remanded for Entry of Corrected Judgments**

J. ROSS DYER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL SR., JJ., joined.

Manuel B. Russ (on appeal) and David Hopkins (at trial), Nashville, Tennessee, for the appellant, Roy Donald Coons, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Glenn Funk, District Attorney General; and Pamela Anderson and Jeff George, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On September 25, 2017, a Davidson County grand jury indicted the defendant for first-degree murder, two counts of first-degree felony murder, attempted rape of a child, and especially aggravated burglary for his crimes against Y.A., his twelve-year-old neighbor.[1]

## I.     Motion in Limine

The defendant filed a motion in limine "to exclude any and all statements alleged to have been made via electronic messaging from [the victim] to her mother . . . on or about August 10, 2017, that someone was knocking on their door, and that she thought it was the man who cuts the grass." The defendant argued the statements were hearsay and, therefore, inadmissible. The State filed a motion to admit the victim's text messages under either the excited utterance, state of mind, or forfeiture by wrongdoing exception to the rule against hearsay and presented the following evidence supporting its position at the pre-trial hearing. Tenn. R. Evid. 803(2), (3); -804(b)(6).

Detective Chad Gish[2] testified that he was provided the victim's mother's cell phone and received her consent to perform an examination of its contents. When Detective Gish opened a messaging application called Google Hangouts, he recovered several text messages from the day of the murder. Although the messages were sent in Spanish, Detective Gish used Google Translate to translate them into English. At 4:15 p.m., on August 10, 2017, the victim sent her mother a text message stating, "Mom, someone is knocking on the door." Four minutes later, at 4:19 p.m., the victim wrote her mother again stating, "I think it was the man who cuts the yard." At 6:07 p.m., the victim's mother responded to the victim stating, "Okay, do not make noise."

Additionally, Detective Gish knew that an iPad had been located near the victim's body, and he attempted to perform an examination of that device. However, because the four-digit passcode that he was provided did not unlock the iPad, Detective Gish received permission to send it to Cellebrite to perform a full extraction. After receiving the iPad's extracted data from Cellebrite, Detective Gish confirmed that the times of the text messages were correct. On cross-examination, Detective Gish agreed that he did not know who physically sent the text messages and that it was possible someone other than the victim sent the messages from the iPad.

The victim's mother testified that she was living in a trailer home with her three children in August 2017. Because she was a single mother, there were times when her

---

[1] It is the policy of this Court to refer to victims of sexual abuse by their initials. For purposes of this opinion, "the victim" will refer to Y.A. unless otherwise noted.

[2] The defendant agreed to stipulate as to Detective Gish's expertise. However, neither the State nor the trial court clarified what Detective Gish's area of expertise was.

children stayed home by themselves while she was at work. However, the victim's mother had strict rules for the children to follow while she was away. They were not to open the door for anyone, and if someone knocked at the door, the children were not to walk around the trailer or make any noise.

On August 10, 2017, the victim stayed home from school because her ankle was hurt. The victim's mother went to work at noon and left the victim alone in the trailer. After work, she picked up her son and saw for the first time the text messages the victim had sent earlier that afternoon. The victim's mother sent the victim a text message stating, "Okay, don't make any noises."

Upon its review, the trial court denied the defendant's motion in limine, finding the victim's text messages qualified under the forfeiture by wrongdoing exception to the rule against hearsay. Tenn. R. Evid. 804(b)(6). The State proceeded to trial with this evidence.

## II.    Trial

The evidence produced at trial showed on August 10, 2017, the victim's mother left the victim home alone while she was at work. The victim had recently hurt her ankle in a skating accident, and her mother told her to stay in her bedroom. The victim's mother was very protective of her children, and the victim was aware that she was not allowed to open the door for anyone or make noise if she heard someone knocking on the door while her mother was not there.

The victim's mother got off of work at 6:00 p.m. and picked up her son. At this time, the victim's mother realized that she had received several text messages from the victim beginning at 4:15 p.m. The first message stated, "Mom, somebody's knocking on the door." Four minutes later, the victim texted, "I think it was the man who cuts the yard." At 6:07 p.m., the victim's mother responded, "Okay, don't make any noise."

The victim's mother arrived home around 6:30 p.m. The victim's sister entered the bedroom she shared with the victim and exclaimed, "Mom, something happen[ed] to [the victim]." The victim's mother ran to the victim's bedroom and instructed the victim's sister to call 911. The victim was lying on the ground on top of a pile of clothing. Her pants and underwear were pulled down, and she had a karate belt tied "two rounds around the neck and it was tied in the back with a double knot." The victim also had blood in her mouth and ears. The victim's mother took the karate belt off of the victim's neck and tried to wipe some of the blood out of her ears with a tissue she got from the front bathroom.

Officer Rodney Phipps with the Metro Nashville Police Department ("MNPD") responded to the 911 call at the Hillview Acres Mobile Home Park. As he approached the

trailer specified in the call, he was greeted by the victim's mother. She was "very frantic" and did not speak much English, but Officer Phipps could tell that she wanted him to go with her to the back of the trailer. Because Officer Phipps knew Officer Brittani Sampson was close behind him, he entered the trailer with the victim's mother. Officer Phipps went into the front bedroom and located the victim on the left side of the room between the dresser and the bed. By that time, Officer Sampson had arrived, and Officer Phipps instructed her to remove the victim's mother from the scene. Officer Phipps checked the victim for a pulse and noted that she was deceased. Within minutes, medical personnel arrived, and Officer Phipps assisted in securing the crime scene.

Detective Curtis Hafley with the MNPD Cold Case Homicide Unit participated in the investigation in an advisory capacity. Upon arriving at the crime scene, Detective Hafley noticed the door to the master bathroom was closed, which was odd since the trailer had already been cleared. Detective Hafley opened the door and observed a pane of glass in the sink. He also noticed the curtains in the window were ripped and the shelving in front of window had been knocked over and was lying on the toilet. Based on the condition of the bathroom, Detective Hafley suspected this window was where the perpetrator exited the trailer following the murder. He examined the area outside of the window and discovered pry marks on the back of the window and indentations on the bottom of the window seal, indicating the perpetrator had forced his way into the trailer through the same window.

Lynette Mace and Officer Warren Fleak with the MNPD Crime Scene Investigation Unit processed the scene, photographing and collecting all evidence. In particular, Officer Fleak collected an iPad, several karate belts, a "complete cigarette," a pair of latex gloves, and the mattress from the victim's bed. Ms. Mace photographed several transfer stains of what appeared to be blood throughout the house including on a toilet paper package in the hallway, on a door, and on the victim's bedframe.

Detective Chris Bowden with the MNPD Youth Services Division, Crimes Against Children and Detective Sandra Smith spoke with residents of the trailer park on the night of the murder and gathered statements from potential witnesses, including the defendant. When they inquired about the defendant's whereabouts that day, the defendant told them he had come and gone throughout the day but had not seen anything suspicious.

Following his conversation with Detective Bowden, the defendant approached Sergeant Toney Turner with the MNPD's Youth Services Division and asked "what was going on." Sergeant Turner explained that they were investigating a crime and noticed the defendant was smoking a cigarette. At some point during their conversation, the defendant discarded the cigarette butt on the ground, and Sergeant Turner asked Officer Fleak to collect it.

- 4 -

Officer Sampson noticed the defendant was the only resident who continued to linger around the area, which she considered abnormal, so she approached him and asked if he had any information to share.  The defendant told Officer Sampson that he had seen some children coming home from school at approximately 3:00 p.m. when he went to get his mail.

Detective Joshua Hill with the MNPD was assigned to lead the investigation.  On August 11, 2017, the day following the murder, Detective Hill was standing in front of the victim's trailer when the defendant walked past him with a pair of purple, latex gloves sticking out of his back pocket. On August 17, 2017, Detective Hill was at the crime scene preparing to release the scene and was approached by the defendant, who apologized for his behavior toward officers on the night of the murder.  Detective Hill informed the defendant that he had not witnessed his behavior that night but stated that he would like to talk to the defendant about the victim's murder.  The defendant agreed to talk to Detective Hill and asked him to come to his residence the following day.

Detective Hill and Sergeant William Kautzman arrived at the defendant's trailer the next day and conducted a recorded interview.  During the defendant's statement, he told Detective Hill that the man who owned the victim's trailer prior to her family had been friends with his father.  Both the defendant and his father had been in the trailer many times when their friend, David Love, lived there.  He denied going inside the victim's trailer since her family moved in, except for the "doorway entrance" to ask about a lawn mower.  The defendant stated that he left his house between 11:00 a.m. and 12:00 p.m. on the day of the murder to get cigarettes and then spent some time in his shed.  At 3:00 p.m., he went to check the mail and saw some children coming home from school.  Afterward, he watched a movie and visited "Joe[3]" for about forty-five minutes.  Finally, he took the dog he was dog-sitting to Cedar Hill Park where he saw an acquaintance named Brad.  A few minutes after returning home, the defendant saw the police arrive at the victim's trailer.  The defendant admitted to speaking to the victim in the past but stated that there was no reason for his DNA to be on her and agreed to provide a DNA sample for comparison.  When Sergeant Kautzman asked the defendant what should happen to the person who murdered the victim, the defendant stated,

> I would, I would pretty much make sure that they endured whatever my child did, you know.  I, like I was telling y'all yesterday Ms. Joe's sister-in-law's husband, the detective was telling her about the, uh, rape and strangulation and stuff like that and --

---

[3] Although the defendant told Detective Hill that he could not remember his neighbor's name and called her "Joe," it is clear from the record that he was referring to Madge Green.

- 5 -

At trial, Detective Hill testified that information regarding how the victim had died, including her strangulation and attempted rape, had not been made public.

After taking the defendant's statement, Detective Hill learned that the defendant and a man named Moses Okoth had a previous encounter with MNPD officers. Mr. Okoth, who was homeless and living in a semi-permanent campsite, agreed to speak with Detective Hill regarding the defendant. Although Mr. Okoth had briefly met the defendant in 2016, the defendant reappeared at the beginning of September 2017, just a few weeks after the murder, and asked Mr. Okoth if he could stay at his tent. Mr. Okoth gave the defendant a spare tent and helped him set up a campsite near him and his girlfriend, Alexandra Hemingway. While living at the campsite, the defendant talked about moving to California and asked Mr. Okoth to come with him. However, Mr. Okoth did not want to move and tried to "put[] it off." Mr. Okoth and Ms. Hemingway also had several conversations with the defendant about God and forgiveness. The defendant would often ask them, "If I ever killed somebody, do you think God would forgive me?" They would advise the defendant to repent and seek forgiveness each time the defendant would pose the question. One day the defendant called Mr. Okoth to his tent and asked him if he had ever killed anyone. Mr. Okoth stated that he had not. The defendant then told Mr. Okoth that he had killed someone but did not say who it was or when it had occurred. However, the defendant stated, "That s**t sticks with you."

Detective Hill testified that he attempted to locate three individuals whose names had been provided as possible investigatory leads: Geri Clayborne,[4] Donald Williams, and Billy Tripani. Although he did an extensive internet search for Ms. Clayborne, Detective Hill was unable to locate her. When Detective Hill called the East Tennessee probation office listed for Mr. Williams, they were unable to confirm or deny whether he was on probation and could not provide Mr. Williams' current contact information. Detective Hill learned that Mr. Tripani was incarcerated at the Bledsoe County Correctional Complex and verified that he had been in custody at the time of the murder.

Kayla Fulton with the MNPD's Drug ID Unit assisted with documenting and collecting evidence from the defendant's silver Chevrolet Cavalier. Ms. Fulton collected numerous items from the vehicle, including a sock and an orange striped polo shirt.

Dr. Feng Li, an expert in forensic pathology and the chief medical examiner for Metropolitan Nashville and Davidson County, performed the autopsy on the victim. Dr. Li testified the victim's cause of death was strangulation and noted the victim suffered from several injuries including multiple contusions on the left forehead, behind the right ear, and

---

[4] Ms. Clayborne's name is spelled various ways throughout the record.

around the left ankle. The victim also had abrasions below the left knee and on the right ankle area. Dr. Li agreed the abrasions on the victim's leg were consistent with her striking a metal bed rail or other metal object. The victim also had petechia hemorrhaging on her forehead, eyelid, cheeks, nasal bridge, the inside of her eye, oral mucous, and right side of her back. Dr. Li opined that, in his experience, the number of petechia hemorrhages was "a lot" and occurs when "the ligature is so tight, it will block the whole blood supply to the brain, so there's no blood supply . . . [and] the pressure builds up." Additionally, the victim had periorbital bruising around both eyes as well as hemorrhaging or bleeding in the whites of her eyes. Dr. Li noted a rectangular shaped abrasion on the victim's right cheek that could be consistent with her hitting her face on the end of a dresser. She also had a patterned abrasion on her right cheek close to her nose that was consistent with being stomped on by a shoe. On the victim's neck, Dr. Li noted abrasions left behind from the ligature used to strangle her. Dr. Li also performed a sexual assault kit on the victim, swabbing for possible DNA sources, but did not note any apparent trauma to the victim's genital area.

Jessica Davis, an expert in latent print comparison and examination with the MNPD, examined latent prints recovered in this case. According to Ms. Davis, none of the prints recovered from the crime scene matched the defendant.

Rachel Mack, an expert in DNA analysis with the MNPD crime laboratory, analyzed several pieces of data found at the crime scene, including DNA swabs taken from the victim's body, curtains from the master bathroom, two karate belts, a tissue from under the victim's bed, swabs taken from the master bathroom window frame, a cigarette butt collected in front of the defendant's trailer, a "complete cigarette" from the crime scene, a pillow from the victim's bedroom, the victim's mattress, hairs collected from the victim's mattress, a Cheetos wrapper, an Ace medical wrap, the bra, underwear, shirt and pants worn by the victim, a feminine hygiene pad, the victim's bedspread, a blanket, fabric from a box spring, swabs from the victim's bed frame and headboard, a white sock, an orange striped polo shirt, swabs from the victim's iPad, swabs from the victim's headphones, and dried secretion swabs taken from the victim's body.

The white sock and orange striped shirt each presumptively tested positive for the presence of blood, and a DNA sample taken from those items matched the defendant. The defendant's DNA was also found on the cigarette butt collected outside of his trailer. Although Ms. Mack's examination revealed the presence of partial foreign DNA from an unknown individual on the yellow karate belt, tissue, pillow, mattress, Cheetos wrapper, bra, shirt, pants, bedspread, headboard, headphones, left breast swab, and S1 swab[5], the

---

[5] According to Ms. Mack's report, the S1 swab was a swab taken from the victim's body. However, the precise location of where the swab was taken is not indicated on the report or in Ms. Mack's testimony.

defendant was excluded as the source of the profile. When running the left breast swab through CODIS, Ms. Mack found a possible association between the partial foreign DNA profile and Geri D. Clayborne, which she noted was an investigative lead that was relayed to investigators. She also found possible CODIS associations between a partial foreign DNA profile on the victim's bra and Donald Williams and Billy Trapani. Additionally, several of the items analyzed by Ms. Mack either did not reveal the presence of blood or the DNA profile was too limited to conclusively determine the contributor. Following her examination, Ms. Mack recommended that several items be sent to the Tennessee Bureau of Investigation ("TBI") and Cybergenetics for additional testing.

Special Agent Charly Castelbuono, a DNA analysis expert with the TBI, conducted YSTR DNA testing, which tests specifically for the male chromosome, on a yellow karate belt and swabs taken from the victim. After testing the right face swabs, right buttocks swabs, and left arm swabs, Special Agent Castelbuono was able to obtain a partial YSTR profile that matched the defendant, and therefore, "he cannot be excluded as the source of this male DNA profile and, barring a mutation, neither can any of his paternal male relatives." The remaining items analyzed by Special Agent Castelbuono either did not contain a YSTR profile or the profile was deemed to be inconclusive.

Jennifer Hornyak, an expert in DNA analysis and DNA evidence interpretation, is a DNA analyst at Cybergenetics, a technology company specializing in DNA interpretation, specifically through the use of their TrueAllele computer software which uses probabilistic genotyping to analyze DNA evidence. In this case, Ms. Hornyak received twenty-three pieces of evidence and used the TrueAllele software to analyze for DNA matches against known samples. When testing a sample from inside the window frame of the master bathroom, the TrueAllele analysis showed that a DNA match to the defendant's DNA profile was 990 million times more probable than a coincidental match to an unrelated Caucasian person. Although Ms. Hornyak only completed a final report on the results from the window frame, her preliminary results also indicated a DNA match between the defendant and the cigarette butt collected in front of the defendant's trailer. According to Ms. Hornyak, the remaining items contained "a lot of female DNA, so that female DNA could be masking any other contributor's DNA."

Detective Chad Gish, an expert in digital forensics with the MNPD's Surveillance and Investigative Support Unit, analyzed several devices associated with this case. Detective Gish performed a physical extraction of the victim's mother's cell phone and recovered several text messages between the victim and her mother on the day of the murder. Although the text messages were in Spanish, Detective Gish used Google Translate to translate them into English. The victim sent her mother a series of texts between 4:15 p.m. and 4:19 p.m. The first text message stated, "Mom, someone is knocking on the door." She then asked, "Already due?" Six seconds later she texted, "It

is." Finally, the victim texts her mother stating, "I think it was the man who cuts the yard." At 6:07 p.m. the victim's mother texted the victim back stating, "Okay, do not make noise." Because the victim's iPad was locked with a four-digit passcode, Detective Gish sent it to Cellebrite to perform an extraction. Upon receiving Cellebrite's report, Detective Gish confirmed the last user-created data was at 4:19 p.m. when the victim sent her mother the final text message.

The victim's mother testified she initially hired Anthony Hinton, the manager of the trailer park, to cut her yard. However, approximately two or three months prior to the murder, she hired the defendant to cut her yard. The victim's mother testified that she also owned a piece of property in Greenbrier. Although the house on the property was uninhabitable, the victim's mother paid a man name Mr. Drexel to maintain the yard. The victim's mother communicated with Mr. Drexel via text message, and Mr. Drexel did not know the victim's mother's address.

Madge Green testified that she lived at Hillview Acres Mobile Home Park in August 2017. The defendant and his father, who lived in a neighboring trailer, would help Ms. Green with yardwork or other tasks around her trailer. On August 10, 2017, Ms. Green arrived home from work just before 5:00 p.m. A short time later, the defendant came by and told Ms. Green that he completed a caulking job she had requested. After Ms. Green paid the defendant, they talked until approximately 5:20 p.m. Ms. Green denied ever telling the defendant that her sister-in-law's husband was a detective or that the victim was raped and strangled.

The defendant called Katherine Cross and Roy Coons, Sr. as witnesses. Katherine Cross, an expert in forensic biology with Guardian Forensic Scientists, reviewed the DNA reports and case files associated with this case. Ms. Cross testified that her analysis of the data indicated there may be another unknown male DNA profile at the crime scene in addition to the one found by Ms. Mack. Regarding YSTR testing statistics, Ms. Cross noted that a Caucasian person, like the defendant, was the least likely contributor to the samples identified as matching the defendant.

Roy Coons, Sr., the defendant's father, testified he lived in the Hillview Acres Mobile Home Park for seventeen years and allowed the defendant to live with him. When Mr. Coons moved there in 2002, he befriended David Love, who lived two trailers down from him. Mr. Coons would go to Mr. Love's trailer "just about every[]day" until Mr. Love passed away in 2015. Although the defendant also went to Mr. Love's trailer to socialize, it was not as frequent as Mr. Coons. The defendant also went inside Mr. Love's trailer to replace the faucets in the front bathroom and to stretch the carpets in the front bedroom. After Mr. Love passed away, Mr. Coons helped move some furniture out of the trailer so the victim and her family could move in. Mr. Coons testified that both he and the

defendant have a skin condition that causes their skin to "flake[] off little places all the time." However, Mr. Coons agreed the defendant's condition was not as severe as his.

Following deliberations, the jury found the defendant guilty of first-degree felony murder (count two), attempted rape of a child (count four), aggravated criminal trespass (count five), and two counts of second-degree murder (counts one and three). The trial court subsequently merged counts one and three into count two and imposed a sentence of life imprisonment. The trial court also imposed a sentence of twenty-five years at 45% for count four and eleven months, twenty-nine days for count five. Counts four and five were to be served concurrently with each other but consecutive to count two, for an effective sentence of life imprisonment plus twenty-five years.

The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

## *Analysis*

On appeal, the defendant argues the trial court erred in admitting the victim's text messages, in admitting an excessive number of photographs of the victim, and in imposing consecutive sentences. The defendant also argues the evidence presented at trial was insufficient to support his convictions. The State contends the trial court properly admitted the text messages and photographs, the trial court properly weighed the bases for consecutive sentences, and the evidence is sufficient.

## I.      Hearsay – Victim's Text Messages

The defendant contends the trial court erred in admitting into evidence the text messages sent from the victim to her mother on the day of the murder. He argues the admission of the messages violated hearsay rules. The defendant submits the trial court erroneously relied on *State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006), and the forfeiture by wrongdoing hearsay exception because there is no proof in the record that he killed the victim to procure her unavailability as a witness. The State responds that the trial court correctly admitted the text messages. Alternatively, the State argues that if the text messages are found to be hearsay, their admission was harmless. Although we agree with the defendant that this evidence was admitted in error, we conclude the error was harmless.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Though hearsay is not admissible evidence, certain exceptions to the rule against hearsay exist. One such exception allows for the admission of a statement made "against a party that has engaged in wrongdoing that was intended to and did procure the

unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6). Before a hearsay statement is entered under this exception, the trial court must conduct a jury-out hearing and determine that "a preponderance of the evidence establishes: 1) that the defendant was involved in or responsible for procuring the unavailability of the declarant; and 2) that [the] defendant's actions were intended, at least in part to procure the absence of the declarant." *Ivy*, 188 S.W.3d at 147; *see also State v. Brooks*, 249 S.W.3d 323, 325 (Tenn. 2008) (stating that, for the forfeiture by wrongdoing exception to apply, the State must show the defendant's actions "were intended, at least in part, to prevent a witness from testifying.").

Here, the defendant contends the State failed to present any evidence to support the contention that the defendant killed the victim to prevent her from testifying against him. Additionally, the defendant argues that while the trial court did conduct a jury-out hearing as required, it failed to make findings that the defendant's actions were intended to procure the absence of the victim. In finding the text messages admissible under the forfeiture by wrongdoing exception to hearsay, the trial court held:

> As I stated yesterday the [c]ourt has reviewed [the defendant's] motion and the reasons behind the State's request to allow the text messages, and the [c]ourt has been persuaded by the third reason and that is forfeiture by wrongdoing, so I will allow it under forfeiture by wrongdoing. All right.

Initially, we note the trial court failed to follow the procedure set forth in *Ivy*. Although a jury-out hearing was held, the trial court failed to determine whether a preponderance of the evidence established "that the defendant was involved in or responsible for procuring the unavailability of the declarant;" and "that [the] defendant's actions were intended, at least in part, to procure the absence of the declarant." *Ivy*, 188 S.W.3d at 147. Furthermore, the State presented no evidence that the defendant's actions were designed to prevent the victim from testifying against him.

The victim's text messages to her mother are out-of-court statements offered to prove that the defendant was at the victim's trailer during the time of her murder. As such, the text messages were hearsay and should have been excluded. However, we conclude any error was harmless beyond a reasonable doubt. *See* Tenn. R. App. P. 36(b). Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. *State v. Jeff Carter*, No. M2009-02399-CCA-R3-CD, 2010-WL-5343212, at *13 (Tenn. Crim. App. Dec. 16, 2010) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)), *no perm. app. filed*. In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result

- 11 -

in prejudice to the judicial process.'" *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)).

Due to the trial court's error, the jury heard about text messages sent by the victim to her mother regarding someone knocking at their door shortly before the victim was killed. The text messages identified the person at the door as "the man who cuts the yard," and the victim's mother testified that she paid the defendant to cut their yard. However, the evidence against the defendant was strong. The victim was found strangled with her pants and underwear pulled down to her knees. Special Agent Charly Castelbuono testified that the defendant's DNA was located on the victim's buttocks, face, and arm. The defendant's DNA was also found on the inside of the master bathroom window frame, where detectives discovered pry marks. Moses Okoth testified the defendant stayed with him in a tent community for the homeless in the weeks following the victim's murder and confessed to having murdered someone. Additionally, the defendant was constantly hanging around the crime scene and engaging with the officers working the scene. Then, when speaking with detectives, the defendant was able to provide details about the murder that had not been released to the public, such as how the victim was killed. Clearly, based on his actions and statements, the defendant was a person of interest to the officers and someone they were and would have investigated without the text messages. Therefore, we conclude any error on the part of the trial court in admitting the text messages was harmless.

## II.    Sufficiency[6]

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of

---

[6] Although the defendant contends the evidence was insufficient "to sustain the convictions in all of the counts of conviction," the argument section of his brief contains no mention of his conviction for aggravated criminal trespass and no rationale as to why it should be reversed. Therefore, any claim that the evidence is insufficient to support the defendant's aggravated criminal trespass conviction is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7).

the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Second-Degree Murder

The defendant argues the evidence at trial is insufficient to support his convictions for second-degree murder. Specifically, the defendant argues the State failed to establish his identity as the perpetrator and contends he "rebutted the reasoning behind the presence of his DNA being present in the trailer and never admitted to being present that day, nor could any witnesses place him there." The State contends the evidence was sufficient to support the defendant's convictions for second-degree murder.

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The burden is on the State to prove the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

Second-degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second-degree murder is a "result of conduct" offense, meaning that the statute focuses "on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d

101, 104-105 (Tenn. Crim. App. 2000). "'Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.'" *State v. Bonds*, 502 S.W.3d 118, 145 (Tenn. Crim. App. 2016) (quoting *Inlow*, 52 S.W.3d at 105).

Here, the evidence showed the victim was strangled with her karate belt while home alone. The defendant voluntarily submitted a DNA sample which matched DNA evidence found on the victim's buttocks, face, and arm, as well as the window frame of the master bathroom where detectives also discovered pry marks. Additionally, the defendant provided detectives with information about the murder which had not been released to the public – the victim was strangled and raped. In the weeks following the murder, the defendant confessed to Mr. Okoth that he had killed someone. Although the defendant argues he rebutted the reasoning behind the presence of his DNA in the victim's trailer, the jury resolved any inconsistencies in testimony in favor of the State, and we will not second-guess the jury in the resolution of any conflicts in the proof. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Accordingly, this evidence is sufficient to support the defendant's convictions, and the defendant is not entitled to relief on this issue.

## B.      Attempted Rape of a Child and Felony Murder

In related arguments, the defendant contends the evidence is insufficient to support his attempted rape of a child conviction because "the sole proof presented by the State to support this count was that the victim's pants were midway down her legs when she was found." He argues "no physical evidence of any kind was ever recovered to support the contention that he attempted an unlawful penetration," including the DNA evidence. As a result, he posits, his felony murder conviction must fail because it was based upon the predicate felony of attempted rape of a child. The State contends the evidence is sufficient.

As relevant to this appeal, first-degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . rape of a child[.]" Tenn. Code Ann. § 39-13-202(a)(2). Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." *Id.* § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any body part of a person's body or any object into the genital or anal openings of the victim's, the defendant's or any other person's body, but emission of semen is not required." *Id* § 39-13-501(7). Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-

- 14 -

12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

In the light most favorable to the State, the evidence shows that the victim's mother discovered the victim strangled on her bedroom floor with her underwear and pants pulled down to her knees. Special Agent Castelbuono testified the defendant's DNA was found on the victim's buttocks. Although Dr. Li testified there was no evidence of apparent trauma to the victim's genital area, the jury could reasonably infer from the condition of the victim's body that the defendant intended to sexually penetrate the victim, and by partially undressing her and touching her buttocks, he took a substantial step toward the commission of the offense. The evidence is sufficient to support his conviction for attempted rape of a child.

Thus, we turn to the sufficiency of the evidence to support the conviction for felony murder in the perpetration of the attempted rape of a child. Viewing the evidence in the light most favorable to the State, the proof revealed that the defendant pried open the master bathroom window of the victim's trailer and entered while the victim was home alone. The victim's mother later found the victim on her bedroom floor with a karate belt tied around her neck. The victim's pants and underwear were pulled down, and there was blood coming out of the victim's mouth and ears. The defendant's DNA was found on the victim's buttocks, face, and arm. Additionally, Ms. Hornyak testified the defendant's DNA was found on the inside of the master bathroom's window frame. The defendant also provided details regarding the murder which had not been released to the public and confessed to Mr. Okoth that he had killed someone. The evidence is, therefore, sufficient to support the defendant's felony murder conviction.

## III.    Admission of Photographs

The defendant argues the trial court erred in admitting an excessive number of photographs of the victim. The defendant argues the photographs allowed the State to inflame the passions of the jury. The State contends the trial court properly exercised its discretion in admitting the photographs.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid.

403.  The admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse of discretion. *See State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017).  This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978).  In determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id.* at 951.  Unfair prejudice occurs when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

Although the defendant generally contends the trial court erred in permitting an excessive number of photographs, he focuses his argument on two specific photographs, Exhibit 32 and #40 of Exhibit 66[7].  Exhibit 32 is a crime scene photograph that depicts the victim's face with most of her facial features blurred out.  Her ear, cheek, mouth, and chin are visible, and blood can be seen in her ear.  Initially, the State requested permission to introduce an unaltered version of the photograph.  However, in a jury-out hearing, the trial court found that showing the face of "a deceased twelve-year-old [raised] an issue of prejudice."  After the State agreed to blur portions of the victim's face, the trial court admitted the photograph into evidence.  This photograph was certainly relevant in that it showed the victim's positioning when found by law enforcement.  Additionally, considering the defendant's contention that his years old DNA was found on multiple places on the victim's body, a picture showing the victim on top of a pile of her own clothing was crucial to the jury's understanding of the competing arguments regarding DNA transfer.  The photograph also showed the victim's ligature marks and the pattern injuries on her cheek.

---

[7] Exhibit 66 is a sealed, collective exhibit containing the fifty photographs the State attempted to introduce through Dr. Li.

Photograph #40 of Exhibit 66 is an autopsy photograph that depicts petechial hemorrhages on the victim's back and an injury on her shoulder. During the trial, Dr. Li testified that these injuries indicated the victim had been forcefully strangled. The trial court considered this photograph during a jury-out hearing along with fifty other autopsy photographs. After considering each one, the trial court admitted only seven of the fifty photographs. This photograph was relevant in that it assisted Dr. Li in explaining the cause and manner of the victim's death to the jury.

Based on the above, it is clear both photographs were relevant and aided in the jury's understanding of the case. Moreover, both photographs were not particularly gruesome, gory, or shocking such that the probative value was substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in admitting the photographs, and the defendant is not entitled to relief on this issue.

## IV.    Consecutive Sentences

The defendant argues the trial court erred in imposing partial consecutive sentences. Specifically, the defendant contends the trial court failed to make the required findings according to *Wilkerson*[8] and overemphasized his prior criminal record. The State contends the trial court properly exercised its discretion in imposing consecutive sentences.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing. *Id.* at 859. This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." *Id.* at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

A trial court "may order sentences to run consecutively" if it finds the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code. Ann. § 40-35-115(b)(4); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d

---

[8] *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995).

at 939.  Our supreme court has stated that the trial court must make specific findings about "particular facts" which show the *Wilkerson* factors apply to the defendant.  *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In imposing consecutive sentences, the trial court articulated its reasons, as follows:

> Now, with respect to 40-35-115, those factors, the [c]ourt does find that the offender has a history of criminal activity.  The defendant, with respect to the [c]ourt's belief, is a dangerous offender by virtue of the fact that a minor child was murdered in this particular case, and the defendant had been previously convicted of offenses and had been on probation, and because of those three factors, then the [c]ourt believes that there should be some form of consecutive sentencing.

It is clear the trial court did not make even a cursory attempt to consider the *Wilkerson* factors.  Because the trial court failed to make the required findings regarding factor (4), this factor does not support consecutive sentencing.  *Pollard*, 432 S.W.3d at 869 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences.").

Despite the lack of a record supporting a finding of dangerous offender, Tennessee Code Annotated section 40-35-115(b)(2) also provides that a trial court may order consecutive sentencing by finding that "[t]he defendant is an offender whose record of criminal activity is extensive."  At the time of sentencing, the defendant's criminal history consisted of ten felonies and thirty-one misdemeanors.  Of those ten felonies two were for aggravated assault, which is a crime of violence.  *See* Tenn. Code Ann. § 39-17-1301(3).  Accordingly, we conclude the defendant's extensive criminal history alone justifies the imposition of consecutive sentencing.  Moreover, the trial court also found the defendant was being sentenced for an offense committed while the defendant was on probation.  *See* Tenn. Code Ann. § 40-35-115(b)(6).  The trial court did not abuse its discretion by imposing consecutive sentences, and the defendant is not entitled to relief on this issue.

Finally, though not raised by either party, we must note one issue concerning the judgments in this case.  The trial court merged counts one and three into count two.  However, no sentences were imposed in counts one and three.  While not required, "the best practice is for the trial court to impose a sentence on each count and reflect the sentence on the respective uniform judgment document."  *State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015).  This eliminates the need for an additional sentencing hearing if the greater conviction is later reversed.  *Id.*  Therefore, we remand the case to the trial court for entry of corrected judgments reflecting separate sentences for counts one and three.

***Conclusion***

For the aforementioned reasons, the judgments of the trial court are affirmed. However, we remand this case for entry of corrected judgments as specified in this opinion.

_____
J. ROSS DYER, JUDGE